IN THE COURT OF CRIMINAL APPEALS OF TENNESSEE
AT NASHVILLE
Assigned on Briefs June 18, 2013

**STATE OF TENNESSEE v. GAI D. KUOT**

**Appeal from the Criminal Court for Davidson County**
**No. 2010-B-1529     Monte Watkins, Judge**

---

**No. M2012-01884-CCA-R3-CD - Filed August 26, 2013**

---

The defendant, Gai D. Kuot, was convicted by a Davidson County Criminal Court jury of premeditated first degree murder, first degree felony murder, and especially aggravated robbery. The court merged the murder convictions and sentenced the defendant to life imprisonment. The court imposed a concurrent sixteen-year sentence on the especially aggravated robbery conviction. On appeal, the defendant argues that: (1) the trial court erred in denying his motion to dismiss for lack of a speedy trial; (2) the trial court erred in admitting, over his objection, hearsay statements of Sammy Sabino; and (3) the evidence is insufficient to sustain his convictions. After review, we affirm the judgments of the trial court.

**Tenn. R. App. P. 3 Appeal as of Right; Judgments of the Criminal Court Affirmed**

ALAN E. GLENN, J., delivered the opinion of the Court, in which NORMA MCGEE OGLE and D. KELLY THOMAS, JR., JJ., joined.

Dwight E. Scott, Nashville, Tennessee, for the appellant, Gai D. Kuot.

Robert E. Cooper, Jr., Attorney General and Reporter; Kyle Hixson, Assistant Attorney General; Victor S. Johnson, III, District Attorney General; and Deborah M. Housel and Brian K. Holmgren, Assistant District Attorneys General, for the appellee, State of Tennessee.

**OPINION**

**FACTS**

On June 11, 2010, the defendant was charged with premeditated first degree murder, first degree felony murder, and especially aggravated robbery, arising out of the shooting death of the victim, Malith Wiek, in the early morning hours of April 21, 2010.

At trial, David Norton, facility manager for Montgomery Bell Academy, "MBA," testified that the victim, a "Lost Boy" refugee from Sudan, obtained employment at MBA as a custodial worker though Catholic Charities and World Relief Refugee Resettlement Programs on June 1, 2004. The victim maintained his employment until his death in April 2010. Norton was the victim's direct supervisor and noted that the victim "got along with everybody."

Norton testified that the victim's shift began at 1:00 p.m. and ended at 10:00 p.m., and he received an annual salary of $23,000. The victim also had a side business of selling long distance phone cards to other members of the refugee community in Nashville. As a result, the victim carried a large roll of cash in his pocket. Norton was never aware of an occasion when the victim was in need of financial assistance. The morning of April 21, 2010, Norton was notified by authorities that the victim was dead. He met with investigators and provided them with the victim's work schedule from the previous night.

Sergeant Mitch Kornberg with the Metro Nashville Police Department testified that he responded to an injured person call at 42nd Avenue North and Indiana Avenue on April 21, 2010. When he arrived, Sergeant Kornberg saw a black male sitting on the ground, leaning against a chain-link fence. The individual had been shot multiple times and was deceased. The body was located in the corner of an L-shaped part of the fence outside a business, and Sergeant Kornberg surmised that the victim had been trapped in this portion of the fence. The victim was wearing a maroon MBA shirt with tan pants and a name tag on a lanyard around his neck. Sergeant Kornberg noticed calling cards or credit cards on the victim's lap.

William Deng testified that he immigrated to the United States in 1995, and he was reacquainted with the victim, his cousin, when the victim moved to the United States in 2004 from Sudan. Deng knew the victim's father, as they were from the same village in Sudan. In 2009, Deng relinquished his apartment and visited Sudan for three months. When he returned to the United States, Deng moved in with the victim and the defendant in their apartment at 5800 Maudina Avenue. The victim and the defendant each occupied a bedroom, and Deng slept on the couch. Deng gained employment at Standard Candy Company about two months after moving in with the victim and the defendant. After he got a job, Deng started paying rent to live in the apartment.

Deng testified that, before his return trip to Sudan, he worked in a security job, which required that he carry a gun. He bought a PT 92 Beretta nine-millimeter at Gun City USA, and he had two magazines for it – one he kept in the weapon and one in the glovebox of his Nissan Pathfinder. Deng stored the gun between the driver's and passenger's seats, hidden from view. On April 12 or 13, 2010, Deng discovered that his gun was missing and called

the police. His car was locked and showed no signs of forced entry. Whoever took Deng's gun did not take its holster or the magazine in the glovebox. The police informed Deng that he had to have the serial number in order to file a report, so he went to Gun City and paid them to retrieve his serial number. After a phone call and visit by Deng, Gun City had still not provided the serial number, although an employee informed Deng that "[t]hey ha[d] a lot of leads[.]" Deng noted that he always placed his keys on the kitchen table when he entered the apartment, as did both the victim and the defendant. He said that he and the victim got along well.

Deng testified that the victim bought calling cards in bulk and sold them to members of the Sudanese community in Nashville, often at a coffee shop on Murfreesboro Road popular amongst the Sudanese men. When the victim received cash for the cards, he either took it to the bank or put it in his pocket. Deng noted that the victim "sometimes" had cash on him. The victim carried the phone cards in a black computer bag that he kept with him or in his room.

Deng testified that, during this time period, he was studying Criminal Justice at Strayer University and attended classes on Monday and Tuesday evenings from 6:00 to 10:00 p.m. On April 20, 2010, Deng got out of class early, around 9:00 or 9:20 p.m., and went home and watched a basketball game. No one else was home at the time, and Deng fell asleep on the couch and did not hear either of his roommates come home that night.

Deng testified that, the next morning, two or three detectives came to the apartment and spoke with him. The detectives knocked on the door to the defendant's bedroom and, although Deng had not heard the defendant come home, the defendant exited his room wearing street clothes. Deng thought it was unusual that the defendant was not wearing "sleeping clothes" like he normally did. After seeing that the defendant was home, Deng expected the victim to be home as well and was surprised that the victim was not in his room.

Deng testified that the officers asked them to come to the police station, and Deng drove himself and the defendant there to be interviewed. Deng recalled that the victim drove a Nissan Sentra, and he showed the police where the victim had bought the car. Afterwards, Deng and the defendant went back to their apartment. Deng asked the defendant if he had spoken with the victim the previous night, and the defendant said, "No." Deng recalled that a funeral service was held for the victim, and the defendant did not attend.

Deng testified that the defendant did not have a job at the time of the murder and had not had one for approximately two years. He said that the defendant had ridden in his car before and knew that he kept a gun in his car. Deng recalled that the victim had loaned money to people, but he was not aware of the victim loaning the defendant any money.

-3-

On cross-examination, Deng denied that the victim told him that he would have to leave the apartment because his name was not on the lease. Deng also denied that he tried to borrow money from the victim when he returned from Sudan and the victim refused to lend it to him. Deng said that he did not meet the defendant in 2007 and that he had only known the defendant for about a year.

Sammy Sabino testified that he was a co-worker of the victim's at MBA. On April 20, 2010, Sabino worked from 5:13 p.m. to 2:07 a.m., and he saw the victim during a work break. Noting that he should have gotten off work already, Sabino asked the victim what he was still doing at work. The victim indicated that he was going to a Kroger store to meet someone, and he was waiting at work until that person's shift started. The victim also told him that he was going to be picking up a roommate in Gallatin later that evening but did not identify which roommate. Around 11:15 p.m., the victim said he was going to Kroger and left in his black Nissan Sentra. Sabino did not see the victim with a jacket that evening. Sabino was aware that the victim sold telephone calling cards and had seen the victim with large sums of money on his person. Sabino had warned the victim that it was not safe to carry around large amounts of cash.

Michael Owens, an employee of the Belle Meade Kroger store, supplied officers with the April 20, 2010 footage from the store's surveillance cameras. The officers asked Owens if Abraham Malook had been working that night and the hours he worked. Owens informed the officers that Malook had stocked items in the dairy department and had worked his entire shift of 11:00 p.m. to 7:00 a.m. The surveillance footage showed a tall, Black man wearing a red shirt and khaki pants leaving a black car and entering the store at 11:31 p.m. The footage showed the same man leaving the store alone at 11:35 p.m.

Stacey Newman testified that she lived at 620 41st Avenue North, which was in close proximity to 42nd Avenue North, in April 2010, and she heard two or three gunshots around 12:30 a.m. on April 21, 2010.

Officer William Kirby with the Metro Nashville Police Department's Identification Unit testified that he responded to the scene at 42nd Avenue North and Indiana Avenue at 8:45 a.m. on April 21, 2010. He took photographs, diagramed the crime scene, and collected evidence. He retrieved four spent nine-millimeter shell casings and one unfired nine-millimeter round from the scene. Two of the spent rounds were located near the victim's feet, as was the unfired projectile, and two spent rounds were located a distance to the east on Indiana Avenue. The location of the two spent rounds on Indiana Avenue led Officer Kirby to believe that the shooter fired as he was moving to the west in pursuit of the victim. In addition, Officer Kirby found various items scattered around the victim's body, one of which was a prepaid phone card. Officer Kirby noted that there was also an empty cell phone

-4-

case attached to the victim's belt. The officer recovered an additional projectile from the warehouse that stood approximately 150 to 200 feet behind the victim's body.

Detective Tim Codling with the Metro Nashville Police Department testified that he responded to the scene where the victim's body was found on April 21, 2010. Detective Codling canvassed the area and also interviewed the bus driver who first saw the victim's body. No one he spoke to heard shots fired or saw anyone fleeing the scene.

Officer Charles Linville with the Metro Nashville Police Department Technical Investigation Section responded to the crime scene at 42nd Street and Indiana Avenue on April 21, 2010, and took photographs of the area. The following day, Officer Linville went to the victim's apartment to collect a sample of the defendant's fingerprints. He also photographed items detectives pointed out while searching two vehicles, William Deng's dark-colored Toyota Pathfinder and the defendant's white Volvo, outside of the apartment and collected some of those items as evidence. Evidence retrieved from the Pathfinder included a magazine of Independence brand nine-millimeter ammunition. Evidence collected from the Volvo included four phone cards and two Western Union receipts. The Western Union receipt indicated that Gai Deng wired $100 to Uganda at 2:30 p.m. on April 20, 2010. The Western Union used by "Gai Deng" was located at the Charlotte Pike Kroger.

Officer Nathaniel Ward with the Metro Nashville Police Department Crime Scene Unit was dispatched to a scene at 1118 Sharpe Avenue on April 21, 2010, to process a black Nissan Sentra parked in the alley that was believed to have been involved in a homicide. There were two bullet holes in the driver's side of the car that appeared to have been fired from the interior of the vehicle, and a cartridge casing was located on the front passenger's side. The driver's side rear window had been shattered by a gunshot, but it could not be determined whether the shot was fired from inside or outside of the car. The victim's wallet was found in the grass near the vehicle. The wallet's contents were found on the ground beside it.

Felicia Evans with the Metro Nashville Police Department Crime Scene Unit testified that she was involved with Officer Ward in processing the black Nissan Sentra recovered from Sharpe Avenue. She noted that the magazine of unfired bullets recovered from the car were Independence nine-millimeter Lugers, a brand that was not "very common to our area." She elaborated that "it is a very rare occasion that you find an entire magazine full of Independence." She recalled that the cartridge casing recovered from the passenger's side of the car between the seat and the door was also Independence brand. Evans stated that the evidence indicated that two shots had been fired from inside the vehicle and exited the vehicle on the driver's side.

Linda Wilson, an expert in latent print examination with the Metro Nashville Police Department, testified that a fingerprint lifted from the back of a camera found in the victim's car belonged to the defendant. On cross-examination, Wilson acknowledged that she had no way of knowing when the fingerprint was placed on the camera.

Dr. Amy McMaster, an expert in forensic pathology, conducted an autopsy of the victim and determined that the victim received a total of eight gunshot wounds. Among these wounds were one to the larynx, a grouping of three to the torso, another to the left lower chest area, one to the left forearm, one to the upper left thigh, and one to the right knee. She said that the gunshot wound to the victim's knee would have made running very difficult and painful. Dr. McMaster did not observe any gunshot residue or soot on the victim's wounds or clothing.

Paul Remijo, a native Kenyan, testified that he met the defendant through his former roommate and had known him for about five months. In April 2010, Remijo lived at 2548 Willow Branch in Antioch. Remijo said that the defendant and Dennis Ogwang were at his house playing cards on April 18, 2010 until about midnight. They did not play cards on April 20, 2010.

Dennis Ogwang testified he last played cards with the defendant on Sunday night, April 18, 2010, at Remijo's house. On Tuesday night, Ogwang was actually playing poker at Bailey's Sports Bar, and the defendant was not there. Ogwang recalled that, before he went to the police station to talk to the police, the defendant called him and asked if the police had called him. Ogwang asked the defendant, "Why," and the defendant responded that he was being investigated for something. The defendant then said to Ogwang, "Hey, if the police ask you, can you tell them that we played cards on Tuesday?" The defendant said that the police would be asking Ogwang if he played cards with him on Tuesday, and the defendant wanted Ogwang to tell them that he had. Ogwang told the police about his conversation with the defendant, and he called the defendant on speaker phone while with the police.

Yvonne Claybrooks testified that, on April 21, 2010, she and her neighbor were sitting on her front porch on DeMoss Road when they saw a white, four-door Volvo with a yellow marking on one of its tires stop in front of the vacant lot next to her house. She saw a black arm reach out the window and throw a red jacket over the car and into the ditch. However, the car's windows were so tinted Claybrooks could not see the driver's face. After the car left, Claybrooks and her neighbor walked down to the ditch to see what had been thrown out. Using a stick, they found a stack of phone cards held together with a rubber band in the middle of the jacket.

Claybrooks testified that the police were in the area the next day searching the location where the jacket had been thrown. As they were searching, Claybrooks saw the Volvo drive down her street. Claybrooks walked over to the police and told them everything that she had seen. The next day, Claybrooks saw a man wearing flip-flops walk completely up and back down her street, talking on his cell phone and looking in the ditch. Claybrooks did not recognize the man, and she thought it was strange that he was wearing flip-flops because most people wore sneakers when they walked on the street for exercise. She thought it was "so strange" to see this individual that she called Detective Truitt. The detective came to her house and showed her a photographic array, from which she identified the defendant as the man she saw walking down the street searching in the ditch.

Royce Cavender testified that he was walking his dog on DeMoss Road around 5:00 p.m. on April 21, 2010 when he noticed a red jacket lying in the ditch with a stack of cards beside it. The jacket looked "out of place," so he called the police.

Officer James Rowland with the Metro Nashville Police Department testified that he responded to "a found property call" on April 21, 2010 on DeMoss Road. After his investigation, he collected a maroon jacket and some calling cards from the ditch beside the road.

Agent Jennifer Shipman, a forensic scientist with the Tennessee Bureau of Investigation, "TBI," testified that one of the exhibits she tested in this case was the red jacket recovered from DeMoss Road. There was blood on the right cuff of the jacket, and the DNA profile was a match to the victim. She later swabbed inside the cuff and the collar of the jacket and was unable to exclude the victim or the defendant as the contributor of the partial profile of DNA she obtained.

Detective Dean Haney with the Metro Nashville Police Department reviewed the victim's cell phone records and tracked which cell phone towers the victim's phone used on the night of the murder. The victim's cell phone was used in the Chickamauga area of East Nashville. Detective Haney testified that when he went to the victim's apartment on April 21, 2010, as part of the investigation, William Deng was present, as was the defendant, who gave the name of Gai Deng. He said that the defendant appeared to be dressed in street clothes. The jury was shown the surveillance footage from the Kroger store during Detective Haney's testimony. Detective Haney said that the subject in the video was wearing similar clothing to what the victim was wearing that night, but the quality of the video prevented a positive facial identification.

Detective Russell Thompson with the Metro Nashville Police Department detailed his actions in investigating the case, including interviewing the defendant twice on April 21,

2010. On April 22, 2010, Detective Thompson was on DeMoss Road looking into some personal property that had been found there. He noted that DeMoss "was kind of a cut-through to M[audina] Avenue, which is where the defendant lived at that time." While there, Detective Thompson saw the defendant drive by in a white Volvo. He later assisted in a third interview of the defendant.

Detective Thompson testified that, in his first interview of the defendant, the defendant said that he had not talked to the victim in person or on the phone since 12:30 p.m. on April 20, 2010, when the victim was going to work. During the second interview of the defendant, the defendant maintained that he had not spoken to the victim on his cell phone. After Detective Thompson received the victim's cell phone records, he learned that there had been several calls between the victim's and the defendant's phones from around 10:30 p.m. until shortly after midnight on the night of the murder, which was contrary to what the defendant had told them.

Detective Thompson testified that the defendant told them that he was playing cards with "Dennis" in Antioch the evening of April 20, 2010. Detective Thompson noted that the defendant had given Detective Truitt permission to look through his cell phone, and Detective Truitt had written down the phone number for Dennis. When the detectives asked the defendant for Dennis' number, the defendant took his phone back, looked through it, handed it back, and said that the number was not in there. Detective Thompson said that they discovered that Dennis' number had been erased.

Detective Thompson testified that the defendant initially told him that he did not know of the victim's having a checking or savings account. However, during his investigation, he learned that checks made out to the defendant had been written from the victim's bank account. The defendant initially told them that the victim had written the checks. During his second interview, the defendant said that the victim had given him the checks.

Detective Thompson testified that they recovered a book from the victim's car. One of the pages had the name "Abraham Malook," next to two dates, "2/27/10 and 3/27/10." Written next to Malook's name was "$400." Detective Thompson stated that the dollar sign in that entry could be a dollar sign or the number eight.

On cross-examination, Detective Thompson acknowledged that the defendant gave them the phone number for the person he was allegedly playing cards with on the night of the murder. He admitted that he did not have a gunshot residue test performed on the defendant even though he interviewed him less than twelve hours after the murder occurred, but he explained that he chose not to do one because "[a]t that point, he [was] just a roommate." Detective Thompson recalled that Abraham Malook owed the victim some

money. On redirect, after refreshing his recollection, Detective Thompson stated that Abraham Malook told the police that the victim had come to the Kroger store where he was employed on April 20 to "ask him about four hundred dollars that he borrowed."

Detective Stanley Truitt with the Metro Nashville Police Department testified regarding the actions he took as lead investigator in this case. He visited the crime scene, then went to the victim's apartment and had both of the victim's roommates go to the police station and interviewed them. After learning from the victim's phone records that the defendant was the last person the victim talked to, Detective Truitt interviewed the defendant a second time because the defendant had originally said that he had not talked to the victim.

Detective Truitt testified that, after the second interview of the defendant, he learned about the recovery of the red jacket and calling cards on DeMoss Road. While on-site speaking with Yvonne Claybrooks, Detective Truitt saw a white Volvo drive by that Claybrooks identified as being the vehicle from which the items were thrown. Detective Truitt could see the driver of the car, whom he identified as the defendant.

Detective Truitt testified that a group of Sudanese lived at 1149 Sharpe Avenue, "in very close proximity" to where the police found the victim's car. Detective Truitt also recalled listening to Ogwang's conversation with the defendant over speaker phone, the "gist" of the conversation being the defendant telling Ogwang to "[j]ust tell them that I was with you playing cards."

Detective Truitt testified that he interviewed the defendant a third time. At some point during the interview, the defendant was asked to write his name and the victim's name, and the defendant changed portions of his name after he had written it but denied doing so. Detective Truitt said that the defendant never admitted that he was not in Antioch or that he wrote and forged the victim's checks.

Detective Truitt testified that he interviewed the defendant's girlfriend, Teresa Bostic, and, based on information she provided, he went to a pawnshop at 801 Gallatin Pike and obtained the store's video surveillance footage from March 29, 2010. The video showed the defendant looking at, among other things, the gun section of the pawnshop. The detective stated that papers were retrieved from the defendant's vehicle that indicated he owed the state for overpayment of unemployment benefits and also had an outstanding debt to a college in Michigan. They also found a request for emergency travel in the defendant's car. Detective Truitt drove the route between where the victim's body and his car were found, and it took him approximately fifteen minutes driving the speed limit.

On cross-examination, Detective Truitt admitted that Abraham Malook had left the

area and could not be found. The detective agreed that the defendant said in his statement that the victim owed him $900 and that was the reason that the checks on the victim's bank account were written to him.

The parties stipulated that the defendant prepared six checks on the victim's account at SunTrust Bank as follows:

(1)  Check number 194; April 8, 2010; $300
(2)  Check number 195; April 10, 2010; $100
(3)  Check number 196; April 13, 2010; $100
(4)  Check number 197; April 17, 2010; $100
(5)  Check number 198; April 18, 2010; $100
(6)  Check number 199; April 19, 2010; $100

All of the checks were made out to the defendant and purported to bear the signature of the victim, but, in fact, the defendant signed the victim's name. The parties further stipulated that the defendant endorsed and cashed the checks.

Agent Michael Frizzell, an expert in the field of law enforcement use of communication records for the TBI, testified that he reviewed the phone records for the victim, the defendant, and William Deng for the time period in question and determined which cell phone antennas were utilized or "pinged" for various calls. He first noted that there were numerous communication events between the defendant's and the victim's cell phones the evening of April 20, 2010, until shortly after midnight on April 21, 2010. The defendant's cell phone "pinged" off of a cell antenna located at 738 Gallatin Pike for every call during this time period.

On April 20, the victim's cell phone first used an antenna close to MBA, where he worked. Around 11:44 p.m., the victim's phone started "pinging" off of different antennas, indicating that he was moving at that time. The final communication from the victim's cell phone occurred with the defendant at 12:13 a.m. on April 21. At that time, the defendant's cell phone "pinged" off the T-Mobile antenna located on Gallatin Pike and the victim's cell phone "pinged" off the Sprint antenna on McFerrin Avenue, which were the closest antennas to 1118 Sharpe Avenue where the victim's car was found.

Agent Frizzell testified that the distance between 184 Twin Oaks Drive in Antioch, an address provided to him by Detective Truitt, and the T-Mobile antenna on Gallatin Pike was 5.9 miles and there were fifty-seven other cell antennas between the two locations. If the defendant's phone was near the Antioch address, it should have used any of those fifty-seven other antennas before it used the antenna on Gallatin Pike. From his investigation,

Agent Frizzell found no times during the particular time frame at issue when the defendant's cell phone "pinged" off of an antenna in Antioch. Agent Frizzell stated the William Deng's cell phone "pinged" only off a cell antenna located near his apartment during the time in question.

The defendant, a native of South Sudan, testified that he considered the victim his best friend and like a brother. He acknowledged that he was not working during the time he lived with the victim but said that he was drawing unemployment and obtained a job at Walmart about a month before the murder. He said that he knew the victim sold calling cards.

The defendant testified that he loaned the victim $900 from his 2008 tax return so the victim could buy a car. He said that the victim could write in English but not very well, so he had other people, including the defendant, fill in his checks for him. The victim had the defendant fill out checks to himself and sign them for him, which were in repayment of the loan. The defendant acknowledged that the victim could write his own name but allowed the defendant to write the checks because he trusted him.

The defendant testified that he possibly had a lapse of memory when he told the police that he did not speak to the victim on the phone on April 20, 2010. He said that the victim had asked him to call if he heard any news about an election going on in Sudan and that was what they discussed. The defendant claimed that he was playing cards in Antioch the first time he spoke to the victim and that he got home around midnight on April 21. He did not see the victim after the victim left for work around noon, and he did not shoot the victim. He did not know why Dennis Ogwang and Paul Remijo would deny playing cards with him that night but thought it might be because they were afraid of the police. He knew William Deng had a pistol, but he did not steal it.

The defendant recalled a time that the victim and William Deng got into an argument after the victim refused to loan Deng $200. The defendant said that Deng was not on their lease agreement, and he only paid rent one of the six months that he lived with them. The victim told Deng that he had to move. The defendant denied being in need of money during the time the victim was killed and said that he was sending money to his family in Africa. The defendant also denied throwing a red jacket and calling cards into a ditch on DeMoss Road.

On cross-examination, the defendant denied that the victim asked him to move out of the apartment. The defendant admitted that he spoke to the victim twice on the phone while the victim was at MBA on April 20. However, he alleged that Sammy Sabino lied regarding the content of their conversation because Sabino could not speak Dinka, a tribal Sudanese language. The defendant said that Yvonne Claybrooks and Dennis Ogwang also lied in their

-11-

testimony. The defendant conceded that he knew a group of Sudanese men who lived on Sharpe Avenue and that he visited Sharpe Avenue regularly when his uncle lived there.

The defendant testified that he was the only person who used his cell phone on the night of April 20. The defendant agreed that Teresa Bostic, his girlfriend at the time of the incident, testified that he was looking for a gun at the pawnshop, but he maintained that he looked at many items in the pawnshop. The defendant admitted that he was in debt to the State of Tennessee for overpayment of unemployment benefits and that he also owed money to a college he attended in Michigan and the IRS. He stated that he only requested emergency travel to Africa because his brother-in-law died, but he conceded that he did not tell Detective Truitt that he intended to leave the country. The defendant denied initially telling the police that he did not know the victim had a bank account.

Following the conclusion of the proof, the jury convicted the defendant, as indicted, of premeditated first degree murder, first degree felony murder, and especially aggravated robbery.

## ANALYSIS

### I. Speedy Trial

The defendant first argues that the trial court erred in denying his motion to dismiss for lack of a speedy trial. He asserts that the two-year span of time between the date of the offenses and the trial date rendered the memories of the State's witnesses unreliable.

The record shows that the defendant was indicted on June 11, 2010, and his case proceeded to trial exactly two years later on June 11, 2012. The case was originally set for trial on October 24, 2011, but was continued because the court elected to hear an older case. The defendant filed a motion to dismiss for lack of a speedy trial on December 8, 2011. The trial court addressed the motion on January 13, 2012 and, after hearing argument from the parties, explained that some of the delay was due to the number of criminal cases in the Davidson County courts and lack of resources. The court ruled:

> I understand [the defendant] wants to go to trial. I want him to have his day in court, and he will have his day in court very soon. I don't think that he has been prejudiced in any way because of the circumstances that we operate under.
>
> As such, I am going to respectfully deny his motion to dismiss. And we will have his trial on the next trial date.

Both the United States and Tennessee Constitutions guarantee criminal defendants the right to a speedy trial. U.S. Const. amend VI; Tenn. Const. art. I, § 9; State v. Utley, 956 S.W.2d 489, 492 (Tenn. 1997). A right to a speedy trial is also statutory in Tennessee. See Tenn. Code Ann. § 40-14-101. The Tennessee Rules of Criminal Procedure provide for the dismissal of an indictment if there exists unnecessary delay in bringing a defendant to trial. Tenn. R. Crim. P. 48(b). The Tennessee Supreme Court employs the balancing test that the United States Supreme Court established in Barker v. Wingo, 407 U.S. 514 (1972), to determine whether a speedy trial violation has occurred. See State v. Simmons, 54 S.W.3d 755, 759 (Tenn. 2001). The Barker test weighs (1) the length of delay, (2) the reasons for the delay, (3) the accused's assertion of the right to a speedy trial, and (4) the prejudice resulting from the delay. Barker, 407 U.S. at 530-32. If a court determines, after applying the Barker balancing test, that a defendant has been denied a speedy trial, the remedy is dismissal of the indictment. Id. at 522. This court reviews the trial court's determination regarding whether the defendant's right to a speedy trial was violated for an abuse of discretion. State v. Hudgins, 188 S.W.3d 663, 667 (Tenn. Crim. App. 2005) (citing State v. Jefferson, 938 S.W.2d 1, 14 (Tenn. Crim. App. 1996)).

We first consider the length of the delay. Generally, post-accusation delay must approach one year to trigger a speedy trial inquiry. See Doggett v. United States, 505 U.S. 647, 652 n.1 (1992); Utley, 956 S.W.2d at 494. Here, the grand jury returned the indictment against the defendant on June 11, 2010, and his case proceeded to trial exactly two years later on June 11, 2012. As such, there was a delay of longer than one year, thus triggering further inquiry. However, we note that a two-year delay is not necessarily unreasonable when compared to other cases. See Simmons, 54 S.W.3d at 759 (in a case with an approximate twenty-three-month delay between the return of the indictment and the defendant's arrest, the court observed that the delay, while "sufficient to trigger the speedy trial analysis, . . . [wa]s not necessarily unreasonable when compared to other cases," citing delays of thirteen years in State v. Wood, 924 S.W.2d 342, 346 (Tenn. 1996) and six years in Doggett, 505 U.S. at 653); State v. Bishop, 493 S.W.2d 81, 84-85 (Tenn. 1973) (finding that a delay of two years supported a defendant's claim of lack of a speedy trial but noting that such delay "is not per se extreme and is not such a length of delay that from this fact alone we would presume prejudice").

Next, we consider the reason for delay. This factor generally falls into one of four categories: (1) intentional delay to gain a tactical advantage over the defense or to harass the defendant; (2) bureaucratic indifference or negligence; (3) delay necessary to the fair and effective prosecution of the case; and (4) delay caused, or acquiesced in, by the defense. Wood, 924 S.W.2d at 346-47.

There is little evidence in the record regarding the reasons for the delay. The record

contains an order of April 21, 2011, whereby the court, at the suggestion of the Vanderbilt University Forensic Evaluation Team, directed the defendant to be evaluated at Middle Tennessee Mental Health Institute to determine the defendant's competency to stand trial and mental condition at the time of the crimes. In its argument at the motion hearing, the State noted that one of the reasons the case was not set for trial immediately was because the defense wanted to have the defendant evaluated by mental health professionals, which "took quite a while," and then the State had the defendant evaluated. Also, in its findings at the hearing on the motion, the court discussed how there was a great number of criminal cases in the Davidson County courts and lack of resources and explained that it had chosen to continue the case from the original trial date in order to hear an older case.

Therefore, the evidence before us suggests that the delay was attributable to a variety of reasons. Part of the delay was apparently due to the evaluation to determine the defendant's competency to stand trial and mental condition at the time of the crimes, which should not weigh against either party as such was "necessary to the fair and effective prosecution of the case." See State v. Paul Graham Manning, No. M2002-00547-CCA-R3-CD, 2003 WL 354510, at *9 (Tenn. Crim. App. Feb. 14, 2003), perm. app. denied (Tenn. Dec. 15, 2003). Part of the delay was also apparently due to the defendant's seeking a mental evaluation, which falls into the category of delay caused or acquiesced in by the defendant and thus weighing against a speedy trial claim, or at least weighing neutrally. Part of the delay was also due to the overcrowded court dockets, which the Tennessee Supreme Court observed in a footnote in Wood falls into the category of "bureaucratic indifference or negligence" and weighs against the State but not as heavily as deliberate delay. See Wood, 924 S.W.2d at 346-47 n.10. Balancing the various reasons for the delay, we conclude that the second Barker factor does not weigh for or against either party.

The third factor to consider when conducting a Barker test is whether the defendant asserted his right to a speedy trial. Barker, 407 U.S. at 531-32. Assertion of the right strongly weighs in favor of the defendant, while failure to assert the right ordinarily will make it difficult to prove that the right has been denied. Id. Here, the defendant filed a motion to dismiss for lack of a speedy trial on December 8, 2011. Therefore, this factor weighs in the defendant's favor. However, the delay prior to the defendant's filing this motion was necessary, rational, and, in some regards, attributable to the defendant. Moreover, once the trial court heard the defendant's motion, it ruled that the defendant's case would be heard at its next trial date and the case commenced as scheduled within five months of the hearing.

The final and most important factor in the Barker analysis is whether the accused has suffered prejudice from the delay. Barker, 407 U.S. at 532. When evaluating this factor,

courts must be aware that the right to a speedy trial is designed (1) to prevent undue and oppressive incarceration prior to trial, (2) to minimize anxiety and concern accompanying public accusation, and (3) to limit the possibilities that long delay will impair the defense. Bishop, 493 S.W.2d at 85; see Smith v. Hooey, 393 U.S. 374, 378 (1969).

The defendant argues on appeal that "[t]he state's witnesses had to rely on their memories of events which happened two years ago, memories which, after that length of time, could hardly be called reliable." However, there is no showing in the record that any witness suffered a loss of memory due to the passage of time, died, or became otherwise unavailable, or that the delay impeded the defendant's ability to defend himself. The defendant, in essence, seeks a *per se* rule of dismissal when there is a delay of two years, but such rule is not supported by case law. See Bishop, 493 S.W.2d at 85. We conclude that the record fully supports the trial court's finding that the defendant was not "prejudiced in any way" by the delay in trying the case.

After applying the Barker balancing test, we conclude that the trial court did not abuse its discretion in denying the defendant's motion to dismiss due to a speedy trial violation. Therefore, the defendant is without relief as to this issue.

The defendant also argues that dismissal is appropriate under Tennessee Rule of Criminal Procedure 48(b). Rule 48(b) of the Tennessee Rules of Criminal Procedure provides that the trial court may dismiss the indictment "[i]f there is unnecessary delay in presenting the charge to a grand jury against a defendant who has been held to answer to the trial court, or if there is unnecessary delay in bringing a defendant to trial." "The decision whether to dismiss an indictment lies within the discretion of the trial court." State v. Harris, 33 S.W.3d 767, 769 (Tenn. 2000) (citing State v. Benn, 713 S.W.2d 308, 311 (Tenn. 1986)). In Benn, the supreme court articulated the analysis required before a trial court may dismiss an indictment under Tennessee Rule of Criminal Procedure 48(b) when the delay falls short of constitutional proportions as follows:

> The factors to be considered in passing on a motion to dismiss under Rule 48(b) where there has been no constitutional violation are the length of the delay, the reasons for the delay, the prejudice to defendant, and waiver by the defendant. Of course, these are the same factors that determine a speedy trial constitutional violation, except for the factor of a defendant's assertion of his right to a speedy trial.

Id. at 311.

We conclude that dismissal of the defendant's case under Rule 48(b) is inappropriate

for the same reasons detailed above in our <u>Barker</u> analysis. The length of the delay, while not minimal, was hardly extreme. The reasons for the delay were attributable to mental health evaluations of the defendant and overcrowded court dockets, and there was no showing of prejudice to the defendant.

## II. Hearsay

The defendant next argues that the trial court erred in admitting hearsay statements of Sammy Sabino.

Hearsay is "a statement, other than one made by the declarant while testifying at the trial or hearing, offered in evidence to prove the truth of the matter asserted." Tenn. R. Evid. 801(c). As a general rule, hearsay is not admissible at trial unless it falls under one of the exceptions to the rule against hearsay. Tenn. R. Evid. 802. One such exception is the state of mind exception, which provides for the admission of a "declarant's then existing state of mind, emotion, sensation, or physical condition (such as intent, plan, motive, design, mental feeling, pain, and bodily health)." Tenn. R. Evid. 803(3). "[Q]uestions concerning the admissibility of evidence rest within the sound discretion of the trial court, and this Court will not interfere in the absence of abuse appearing on the face of the record." <u>Pylant v. State</u>, 263 S.W.3d 854, 870 (Tenn. 2008).

When the State called Sabino to the stand, the defense lodged a hearsay objection to Sabino's expected testimony that the victim told him that he was going to pick up his roommate. The State acknowledged that the statement was hearsay but argued that it was admissible under Tennessee Rule of Evidence 803(3), an exception for the declarant's "existing mental, emotional, or physical condition." The court asked the State to call Sabino out of order so the issue could be researched and resolved at a later time. Thereafter, the court ruled that Sabino's expected testimony was admissible.

During Sabino's testimony, the defense objected as Sabino was getting ready to testify as to what the victim told him as to why he was still at work. The court ruled that Sabino could answer that particular question, and the State questioned Sabino as follows:

Q: Mr. Sabino, did [the victim] tell you that he was going to go to a Kroger store later on that evening to meet with an individual?

A: Yes.

Q: And that he was staying at work until that person came on shift before he went to that Kroger store?

-16-

A:    Yes.

Q:    Did [the victim] . . . also tell you that he was going to be picking up a roommate in Gallatin later on that evening?

A:    Yes.

Q:    Did [the victim] identify the name of that roommate?

A:    No.

The defendant concedes that Sabino's testimony "appears to fall within the exception provided by Tenn. R. Evid. 803(3)" but asserts that "upon closer scrutiny, it does not bear sufficient specificity, and is too ambiguous to be acceptable under that provision." He points to the fact that the victim could have been meeting either of his two roommates and that there was no evidence that the victim actually traveled to Gallatin. The statement clearly exhibits the victim's then existing state of mind – his intent and plan to meet someone at Kroger and then pick up his roommate in Gallatin, and the supporting evidence provides context for the victim's statement. The defendant's complaints regarding Sabino's testimony go to its weight and not admissibility. Any ambiguity in the victim's statement concerning his plan could have actually benefitted the defendant by allowing him to argue that the victim was meeting William Deng and not him. Moreover, even though there was no evidence that the victim traveled to Gallatin, the jury could have easily determined that the victim was referring to the area around Gallatin Pike in Nashville, not the actual town of Gallatin. We cannot conclude that the trial court abused its discretion in admitting Sabino's testimony under the state of mind exception to the hearsay rule.

### III. Sufficiency of the Evidence

The defendant challenges the sufficiency of the convicting evidence. He does not dispute that the elements of the offenses were established, only the sufficiency of the evidence establishing his identity as the perpetrator. He asserts that all of the evidence was circumstantial, and no physical evidence directly linked him to the crimes.

In considering this issue, we apply the rule that where sufficiency of the convicting evidence is challenged, the relevant question of the reviewing court is "whether, after viewing the evidence in the light most favorable to the prosecution, *any* rational trier of fact could have found the essential elements of the crime beyond a reasonable doubt." Jackson v. Virginia, 443 U.S. 307, 319 (1979); see also Tenn. R. App. P. 13(e) ("Findings of guilt in criminal actions whether by the trial court or jury shall be set aside if the evidence is

-17-

insufficient to support the findings by the trier of fact of guilt beyond a reasonable doubt."); State v. Evans, 838 S.W.2d 185, 190-92 (Tenn. 1992); State v. Anderson, 835 S.W.2d 600, 604 (Tenn. Crim. App. 1992). The same standard applies whether the finding of guilt is predicated upon direct evidence, circumstantial evidence, or a combination of direct and circumstantial evidence. State v. Matthews, 805 S.W.2d 776, 779 (Tenn. Crim. App. 1990).

A criminal offense may be established entirely by circumstantial evidence. State v. Majors, 318 S.W.3d 850, 857 (Tenn. 2010). It is for the jury to determine the weight to be given the circumstantial evidence and the extent to which the circumstances are consistent with the guilt of the defendant and inconsistent with his innocence. State v. James, 315 S.W.3d 440, 456 (Tenn. 2010). In addition, the State does not have the duty to exclude every other reasonable hypothesis except that of the defendant's guilt in order to obtain a conviction based solely on circumstantial evidence. See State v. Dorantes, 331 S.W.3d 370, 380-81 (Tenn. 2011) (adopting the federal standard of review for cases in which the evidence is entirely circumstantial).

All questions involving the credibility of witnesses, the weight and value to be given the evidence, and all factual issues are resolved by the trier of fact. See State v. Pappas, 754 S.W.2d 620, 623 (Tenn. Crim. App. 1987). "A guilty verdict by the jury, approved by the trial judge, accredits the testimony of the witnesses for the State and resolves all conflicts in favor of the theory of the State." State v. Grace, 493 S.W.2d 474, 476 (Tenn. 1973). Our supreme court stated the rationale for this rule:

> This well-settled rule rests on a sound foundation. The trial judge and the jury see the witnesses face to face, hear their testimony and observe their demeanor on the stand. Thus the trial judge and jury are the primary instrumentality of justice to determine the weight and credibility to be given to the testimony of witnesses. In the trial forum alone is there human atmosphere and the totality of the evidence cannot be reproduced with a written record in this Court.

Bolin v. State, 219 Tenn. 4, 11, 405 S.W.2d 768, 771 (1966) (citing Carroll v. State, 212 Tenn. 464, 370 S.W.2d 523 (1963)). "A jury conviction removes the presumption of innocence with which a defendant is initially cloaked and replaces it with one of guilt, so that on appeal a convicted defendant has the burden of demonstrating that the evidence is insufficient." State v. Tuggle, 639 S.W.2d 913, 914 (Tenn. 1982).

In the light most favorable to the State, the evidence shows that the defendant had been unemployed for a long period of time, was in debt, and was sending money to family in Africa. In the two weeks leading up to the victim's murder, the defendant wrote six

checks to himself from the victim's bank account. The defendant claimed that the checks were in repayment for money he had loaned the victim, but the jury was within its province to not believe the defendant's explanation. Despite his obviously knowing that the victim had a bank account, the defendant initially denied any such knowledge to the police.

The defendant knew that the victim had a steady job and also sold calling cards as a side business. About three weeks before the murder, the defendant looked at guns in a pawnshop. William Deng, the victim's and the defendant's roommate, had his gun stolen from his vehicle approximately a week before the murder. There were no signs of forced entry into Deng's vehicle, and Deng often left his keys on the kitchen table in their apartment. The evidence strongly supports the inference that Deng's weapon was used in the murder, as Independence brand shells were found by the victim's body and a spent casing recovered from the victim's car was also Independence brand. Independence was the brand Deng kept with the gun, and Officer Evans noted that Independence brand was not often seen in the Nashville area.

The defendant's repeated contention that he was playing cards in Antioch on the night of the murder was refuted by his cell phone records and by the testimony of the two witnesses, Paul Remijo and Dennis Ogwang, he claimed to be with. The defendant essentially asked Ogwang on two occasions, one of which while Ogwang was on speaker phone with the police, to lie to the police concerning the defendant's whereabouts on the night of the murder.

The defendant's initial claim that he had not spoken to the victim on the night of the murder was discounted by both men's cell phone records and the defendant's later admission. Although the defendant claimed that they were talking about an election in Sudan, the victim's statement, as reported by Sammy Sabino, that he was picking up his roommate in Gallatin gives context to these phone conversations.

Later in the day of the murder, the driver of a car matching the description of the defendant's car was seen throwing a red jacket with the victim's blood on it into a ditch on DeMoss Road, near the defendant's apartment. The next day, an officer on the scene was talking to Yvonne Claybrooks, a resident of DeMoss Road, when Claybrooks saw the same car drive by again. The officer was able to see the driver, whom he identified as the defendant. The following day, Claybrooks saw a man wearing flip-flops, whom she later identified from a photographic array as the defendant, walk up and down the street searching in the ditch.

Upon review, we conclude that this evidence, albeit circumstantial, is sufficient for a rational trier of fact to find that the defendant was the perpetrator of the offenses.

-19-

## CONCLUSION

Based on the foregoing authorities and reasoning, we affirm the judgments of the trial court.

_____
ALAN E. GLENN, JUDGE